# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CIVIL CASE NO. 1:20-cv-00058-MR

| | |
|---|---|
| **BENSON MOORE,** )<br>)<br>**Plaintiff,** )<br>)<br>**vs.** )<br>)<br>**KENNETH LASSITER, et al.,** )<br>)<br>**Defendants.** )<br>_____ ) | **MEMORANDUM OF**<br>**DECISION AND ORDER** |

**THIS MATTER** is before the Court on the Motions for Summary Judgment filed by Defendants Mike Slagle, Norma Melton, Brandon Barrier, Gladys Jean Campbell [Doc. 87] and Defendant Jeffrey Patane [Doc. 94].

## I.     BACKGROUND

The incarcerated Plaintiff Benson Moore, proceeding pro se, is presently incarcerated in the North Carolina Department of Adult Corrections ("NCDAC").[1] He filed this civil rights action in the United States District Court for the Middle District of North Carolina, addressing incidents that allegedly occurred while he was incarcerated at multiple correctional institutions. [Doc. 2: Compl.].  The Middle District dismissed all of the claims save for

_____

[1] NCDAC was previously called the North Carolina Department of Public Safety ("NCDPS"). These terms are used interchangeably in this Order.

those that allegedly occurred at the Mountain View CI ("MVCI"), and transferred the case to this Court where venue lies for the remaining claims. [See Doc. 12: Transfer Order].

Upon transfer, this Court reviewed the verified Complaint[2] for frivolity. [Doc. 2: Compl.]. The Plaintiff's claims pursuant to 42 U.S.C. § 1983 passed initial review for deliberate indifference to a serious medical need against Defendants Slagle, Melton, Barrier, and Campbell.  [Doc. 19: Initial Rev. Compl.].  The Plaintiff's verified Supplemental Complaint subsequently passed initial review against these Defendants for alleged acts of deliberate indifference to a serious medical need that occurred after the date the Complaint was filed.  [Doc. 41: Supp. Compl.; Doc. 40: Initial Rev. of Supp. Compl.].  The Plaintiff filed an unverified Second Amended Complaint[3] that again passed initial review against these Defendants, and it also passed initial review against Defendant Patane[4] for deliberate indifference to a serious medical need.  [Doc. 55: Second Am. Compl.; Doc. 60: Initial Rev.

_____

[2] While the Complaint refers to a number of "exhibits," the documents attached to the Complaint are not labelled in accordance with the mentioned exhibits, nor do the documents appear to correspond to the exhibits described in the Complaint.

[3] The Second Amended Complaint purports to incorporate by reference several paragraphs of the Complaint that do not exist. [See, e.g., Doc. 55: Second Am. Compl. at 8, 10-11 (referring to Doc. 2 at ¶¶ 230, 245, 260, 261, 272)].

[4] Patane is employed through Consilium Staffing. [Doc. 113: Patane Decl. at ¶ 3].

2

Second Am. Compl.]. The Plaintiff generally alleges that the Defendants disbelieved and inadequately treated his complaints of pain while he resided at MVCI. [Doc. 55: Second Am. Compl.].

The Defendants filed Motions for Summary Judgment. [Docs. 87: MSJ; Doc. 94: Patane MSJ]. Thereafter, the Court entered Orders in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing responses to the summary judgment motions and of the manner in which evidence could be submitted to the Court. [Docs. 90, 115: Roseboro Orders]. The Plaintiff filed an Affidavit and supporting materials opposing summary judgment. [Doc. 116: Plaintiff's Affid.; Doc. 117: Response Ex]. These matters, therefore, are ripe for disposition.

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" in the record. See id.; Fed. R. Civ. P. 56(c)(1)(a). Namely, the nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. To that end, only evidence admissible at trial may be considered by the Court on summary judgment. Kennedy v. Joy Technologies, Inc., 269 F. App'x 302, 308 (4th Cir. 2008) (citation omitted).

4

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party.  <u>Anderson</u>, 477 U.S. at 255.  Facts, however, "must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  <u>Scott v. Harris</u>, 550 U.S. 372, 380, 127 S.Ct. 1769, 1776 (2007).  As the Supreme Court has emphasized,

> "[w]hen the moving party has carried its burden under Rule 56(c), the opponent must do more than simply show there is some metaphysical doubt as to the material facts ….  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87, 106 S. Ct. 1348 (1986) (footnote omitted).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-28, 106 S. Ct. 2505 (1986).  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

<u>Scott</u>, 550 U.S. at 380.

## III. FACTUAL BACKGROUND

The relevant forecast of evidence, viewed in the light most favorable to the Plaintiff, shows the following.[5]

The events at issue occurred at MVCI where Mike Slagle is the Warden. [Doc. 89-1: Slagle Decl. at ¶ 2]. Slagle is a nonmedical employee who lacks access to medical records. [Id. at ¶ 6-8]. He cannot modify medical restrictions or accommodations, or control prison transfers. [Id. at ¶¶ 3-8].

Physician Assistant ("PA") Jeffrey Dean Patane provided care and medical oversight at MVCI. [Doc. 113: Patane Decl. at ¶¶ 2, 4]. PA Patane, however, "had no control of setting outside provider appointments or control [of] the timing of those appointments," and he could not discipline inmates. [Id. at ¶¶ 24, 28(h)]. Nurse Supervisor Melton supervised facility nursing staff, provided clinical and administrative consultation, and ensured that adequate health care was provided to inmates. [Doc. 89-9: Melton Decl. at ¶ 2; see Doc. 17-1 at ¶ 4]. Campbell and Barrier were nurses. [Doc. 89-22: Campbell Decl. at ¶ 2; Doc. 89-3: Barrier Decl. at ¶ 2].

---

[5] The Court will not attempt to exhaustively address the voluminous materials, including medical records, that the parties have filed. The Court highlights the relevant forecast of evidence and the factual discrepancies between the parties' accounts of the incidents. Materials that are irrelevant or unreliable have been omitted from this section. [See, e.g., Docs. 116-1 at 1, 117 at 1 (declaration of a certified medical assistant that Plaintiff describes as an "Expert Opinion")].

MVCI was an acuity level 2A/B facility that administered medications and provided medical treatment at the clinical level. [Doc. 89-1: Slagle Decl. at ¶ 3]. Inmates submitted written sick call requests to be evaluated by nursing staff and, if indicated, they were scheduled to see a physician, physician assistant, or nurse practitioner. [Doc. 113: Patane Decl. at ¶¶ 12-13]. Specialty care was not provided at MVCI. [Id. at ¶ 22]. Outside care was purchased by NCDPS through the UR ("Utilization Review") process. [Id.]. Outside providers would submit UR requests, which would then be reviewed based on NCDPS policies and guidelines. [Id. at ¶ 23]. If a NCDPS provider agreed with an outside provider's recommendation, the order would be entered into the inmate's chart. [Id. at ¶ 16].

The Plaintiff broke his femur in 1995, and it was surgically repaired. [Doc. 2: Complaint at ¶ 2]. The Plaintiff's 31-year sentence commenced in 2003. [Doc. 89-1: Slagle Decl. at ¶ 3]. After the Plaintiff entered NCDPS, he began receiving x-rays, over-the-counter medication, and accommodations for severe "pains [that] were assumed to be associated with his …" prior surgery. [Doc. 2: Complaint at ¶¶ 4-6]. He was told that "there is probably arthritis in the injured leg [and the] possibility of always having pains." [Id. at ¶ 5]. The Plaintiff saw multiple specialists, including an orthopedist, and he

7

received treatment and medication including Tramadol,[6] for pain. [Doc. 113: Patane Decl. at ¶¶ 19, 28(a); Doc. 89-4: MSJ Ex at 9 (Dec. 1, 2017 Clinical Encounter)]. His reports of pain continued despite treatment.[7] [Doc. 113: Patane Decl. at ¶ 19, 28(a)].

Chronic pain is multi-factorial. [Id. at ¶ 19]. The amount of time that is required for a clinician to find an appropriate treatment varies greatly depending on the number of medical issues present, and their severity and complexity. [Id.]. There are certain conditions that cannot be completely cured or remedied with modern medicine. [Id.].

Between December 1, 2017 and December 30, 2019, while the Plaintiff resided at MVCI, the Plaintiff had 59 sick calls, eight dental sick calls, six self-declared medical emergencies, radiology including MRIs and x-rays, and five outside medical provider appointments that included treatment such as joint injections. [Doc. 89-21: Murphy Decl. at ¶ 3; Doc. 2: Complaint at ¶¶ 129, 190; Doc. 41: Supp. Compl. at ¶¶ 216, 218; Doc. 110: Patane Ex at 1].

---

[6] The opiate narcotic Tramadol is a Schedule IV controlled substance that may be habit-forming, especially with prolonged use. See United States v. Hasson, 26 F.4th 610, 612 (4th Cir. 2022); 21 U.S.C. § 821(b)(4); [Doc. 113: Patane Decl. at ¶ 28(a)]. The Plaintiff received Tramadol in NCDPS between October 2016 and July 2017. [Doc. 113: Patane Decl. at ¶ 28(a)].

[7] The Plaintiff now describes Tramadol as "effective." [Doc. 116: Plaintiff's Affid. at ¶ 7].

When the Plaintiff was transferred to MVCI on December 1, 2017, he was a level 2A inmate requiring medications only. [Doc. 89-1: Slagle Decl. at ¶ 3; Doc. 113: Patane Decl. at ¶ 10]. The Plaintiff presented in a wheelchair for his initial intake assessment. [Doc. 89-4: MSJ Ex at 9; Doc. 89-4: MSJ Ex at 9-12]. Patane examined the Plaintiff, took his history, and reviewed a recent MRI showing "mild spondylosis/facet arthrosis resulting in mild central canal stenosis, and mild left L4-5 foraminal narrowing…." [Doc. 89-4: MSJ Ex at 9]. The medical records revealed "no organic cause for his continued hip pain, which made treatment difficult." [Doc. 113: Patane Decl. at ¶ 20]. The Plaintiff's history and the physical exam findings were "discordant…." [Id. at ¶ 25(a); Doc. 89-4: MSJ Ex at 11 (Dec. 1, 2017 Clinical Encounter)]. Patane was concerned that the Plaintiff's use of a wheelchair at his relatively young age (40) would exacerbate his condition and pain. [Doc. 113: Patane Decl. at ¶ 26(b)]. Based on that, and "given relatively benign MRI findings and unimpressive findings" at intake, Patane requested a neurological assessment. [Id.; Doc. 89-4: MSJ Ex at 11 (Dec. 1, 2017 Clinical Encounter)].

Patane and Melton told the Plaintiff that his pain was "psychological due to [his] lengthy sentence." [Doc. 5: Plaintiff's Decl. at ¶¶ 2, 7; Doc. 2: Compl. at ¶ 102; Doc. 116: Plaintiff's Affid. at ¶ 4]. Patane said that the

Plaintiff was "not in as much pain as he claims" and that they would be requesting a second opinion "due to [the Plaintiff] being a 40 year old African-American." [Doc. 5: Plaintiff's Decl. at ¶ 7; Doc. 11: Mo. to Amend at 2; Doc. 27: Mo. to Alter/Amend ¶ 4]. Patane said that the Plaintiff should see a psychiatrist, but no referral was provided. [Doc. 2: Compl. at ¶ 102; Doc. 5: Plaintiff's Decl. at ¶ 7; Doc. 116: Plaintiff's Affid. at ¶ 4]. The Plaintiff could have sought mental health counseling himself. [Doc. 113: Patane Decl. at ¶ 25(e); see, e.g., Doc. 17-1: Plaintiff's Decl. at ¶ 8 (at MVCI, Plaintiff submitted four mental health referrals)].

The Plaintiff had "multiple extra items" at intake at MVCI, including: an air mattress, ice, an extra pillow, a special mattress, thermal underwear, and an extra blanket. [Doc. 89-4: MSJ Ex at 11 (Dec. 1, 2017 Clinical Encounter); Doc. 113: Patane Decl. at ¶ 25(b)]. Patane was "not aware of any disability or medical indication that Plaintiff had requiring these extra items," so they were removed.[8] [Doc. 113: Patane Decl. at ¶ 25(b)]. On December 4, 2017, the Plaintiff made a medical emergency call for pain; when he saw Barrier, he told her that he wanted his "extra stuff" back. [Doc. 89-3: Barrier Decl. at

---

[8] The Plaintiff attributes the removal of accommodations to Melton and Patane [Doc. 5 at ¶¶ 2, 7], and alternately to Patane only. [Doc. 17-1 at ¶ 8; Doc. 116 at ¶ 2]. NCDPS records reflect that it was Patane who adjusted the accommodations. [Doc. 89-10: MSJ Ex at 1 (Medical Duty Status); see Doc. 89-9: Melton Decl. at ¶ 5(a); Doc. 113: Patane Decl. at ¶ 25(a)].

¶ 3; Doc. 89-4: MSJ Ex at 2]. Barrier noted that the Plaintiff was in no apparent distress and was able to "ambulate . . . without any difficulty...." [Id.]. Barrier stated that the Plaintiff was not in pain and denied his accommodation request. [Doc. 2: Compl. at ¶ 106].

While the Plaintiff arrived at MVCI with ibuprofen, shortly thereafter, Patane switched him to a stronger medication, Diclofenac. [Doc. 113: Patane Decl. at ¶ 25(c)]. On February 13, 2018, Dr. Gloria Liu at Duke Spine recommended Gabapentin.[9] [Doc. 2: Compl. at ¶ 123; Doc. 100: Patane Ex at 1]. The Plaintiff did not have any condition that Gabapentin treats, however, so Patane did not order it. [Doc. 116 at ¶¶ 6, 9; Doc. 113: Patane Decl. at ¶ 26(d)].

The Plaintiff took Pepcid and Omeprazole due to the fact that he was taking NSAIDs, but he had no special diet, allergies, or digestive issues noted in his medical records. [Doc. 113: Patane Decl. at ¶ 28(g)]. On December 5, 2017, Patane cancelled a UR request for a colonoscopy because it was not indicated by the Plaintiff's age, "[past medical history] and [history of present illness] and exam findings...." [Id.; Doc. 17-7: Decl. Ex at 4]. A UR request was submitted for a colonoscopy in February 2020 when

_____

[9] Also referred to as Neurontin. Gabapentin is sometimes used to treat neuropathic pain. [Doc. 113: Patane Decl. at ¶ 26(d)].

the Plaintiff reported symptoms. [Doc. 113: Patane Decl. at ¶ 28(g)]. The Plaintiff received a colonoscopy in late 2020, which revealed a small polyp but required no dietary restrictions. [Id.].

The Plaintiff had a lumbar MRI on March 9, 2018. [Doc. 2: Compl. at ¶ 129]. On June 22, 2018, officers overheard Dr. Liu at Duke Spine tell the Plaintiff that there was "no medical reason he cannot walk." [Doc. 89-9: Melton Decl. at ¶ 11; see Doc. 17-4: Plaintiff Ex at 3-4 (Witness Statements)]. This was the same conclusion that Patane had reached on intake. [Doc. 89-5: MSJ Ex at 6]. On July 13, 2018, Patane cancelled a UR request for a neurological assessment because the Plaintiff "return[ed] from Duke Ortho w/orders to [return to clinic] oct 2018." [Doc. 17-7: Decl. Ex at 2 (July 13, 2018 Clinical Encounter)]. For the next two years, Patane continued to deny "effective" pain medication, and to prescribe the Plaintiff two "ineffective" NSAIDs, despite the Plaintiff's "digestive issues." [Doc. 116: Plaintiff's Affid. at ¶ 10; Doc. 11: Mo. to Amend at 2].

Nurse Campbell saw the Plaintiff on December 19, 2018 on a medical emergency call for pain. [Doc. 2: Compl. at ¶ 173]. At that time, the Plaintiff said that it was "the same pain I've had since being in this prison." [Doc. 89-22: Campbell Decl. at ¶ 4]. Campbell told the Plaintiff that his "pains won't kill him" and refused to assess him because he did not meet the criteria for

12

an emergency. [Doc. 2: Compl. at ¶ 173; Doc. 89-22: Campbell Decl. at ¶ 4].

On February 4, 2019, Dr. Liu administered a corticosteroid injection and recommended Meloxicam. [Doc. 2: Compl. at ¶ 190]. On April 15, 2019, Dr. Liu administered facet joint injections. [Doc. 110: Patane Ex at 1]. The Plaintiff continued to request stronger pain medications at MVCI; Barrier denied these requests and expressed skepticism about the Plaintiff's reports of pain. [See, e.g., Doc. 11: Mo. to Amend at ¶ 207 (on April 12, 2019, Barrier said "you're faking and you're not getting anything other than Tylenol or Ibuprofen"); Doc. 2 at ¶ 200 (on Feb. 28, 2019, Barrier told Plaintiff that he had been prescribed Tylenol 500 and "moxelcam [sic]" and "you can walk just fine"); Doc. 89-5 at 2 (Feb. 28, 2019 Clinical Encounter noting that Plaintiff had not picked up his Tylenol and Mobic, stating "I want something better"); Doc. 41: Supp. Compl. at ¶¶ 207 (April 12, 2019, stating "you're faking and you're not getting anything other than Tylenol or Ibuprofen"), 224 (July 6, 2019, stating the Plaintiff was "fine" on emergency sick call for a fall, despite a "knot and dried up blood"); Doc. 78-1: Plaintiff's Decl. at ¶ 7 (Barrier stating "we know you're faking, we got pictures of you," and "just stop the bullshit and stop wasting our time, nothing going to be done for you here")].

On March 21, 2019, Dr. Liu again recommended Gapabentin. [See Doc. 89-19: MSJ Ex at 1 (March 25, 2019 Clinical Encounter)]. Patane requested a UR review of the Plaintiff's file on March 25 because Patane was "uncertain as to whether additional specialty consultation would have any clinical and/or effect outcome." [Id.]. UR instructed MVCI to manage the Plaintiff "on site for now." [Doc. 101: Patane MSJ Ex at 2 (UR Summary)].

On August 19, 2019, Patane requested Tramadol because "first line" medications did not work and the Plaintiff continued to claim intractable pain; UR approved the request. [Doc. 113: Patane Decl. at ¶ 28(a)]. The Plaintiff, however, failed to sign a pain contract,[10] so Patane did not order the Tramadol. [Id. at ¶ 28(c); Doc. 104: Patane Ex at 1 (Oct. 4, 2019 Clinical Encounter no-show); Doc. 106: Patane Ex at 1 (Nov. 8, 2019 Clinical Encounter "no further work-up or [treatment] would be recommended" unless Plaintiff signs a pain contract)].

In July and August 2019, the Plaintiff underwent psychological testing that showed possible malingering. [Doc. 111: Patane Ex at 1, 5]. The testing provider noted that individuals with scores like the Plaintiff's typically have "great feelings of hostility and aggression," they "tend[] to be belligerent and

---

[10] Patane has inmates sign a pain contract before they start taking Tramadol because it may be habit-forming. [Doc. 113: Patane Decl. at ¶ 28(a)].

14

abrasive," and they "present with somatic concerns, which at times can be so intense that they border on being delusional." [Id.]. The Plaintiff's treatment was further complicated because the Plaintiff refused to cooperate with treatment, show up for appointments, and participate in his care. [Doc. 113: Patane Decl. at ¶ 21; Doc. 89-19 at 1 (March 25, 2019 Clinical Encounter); Doc. 89-5 at 5 (Feb. 19, 2019 Clinical Encounter noting "no show[s]"); Doc. 11 at ¶ 234 (July 29, 2019 refusal to see Patane)].

Barrier continued to express skepticism about the Plaintiff's pain, and he refused to see the Plaintiff when the Plaintiff took too long to arrive for sick calls or was unable to step onto a scale unassisted. [Doc. 41: Supp. Compl. at ¶¶ 245 (Sept. 25, 2019 refusal), 291 (July 14, 2021 no-show); 251 (Oct. 11, 2019, denying stronger medication because "pains are all in your head")].

On November 8, 2019, Patane told the Plaintiff that he was tired of the Plaintiff's sick calls, was "done" with him, and would not provide any more medication. [Id. at ¶¶ 208, 260]. When the Plaintiff again requested Tramadol, Patane threw the Plaintiff out of his office; this resulted in the Plaintiff's placement in solitary confinement for causing a disturbance. [Id. at ¶¶ 261, 264]. The Plaintiff ultimately received Gabapentin and Tramadol from another prison provider in mid-2021. [Id. at ¶¶ 290, 300)].

15

The Plaintiff and his family expressed their concerns to Nurse Supervisor Melton and Warden Slagle about the Plaintiff's medical care at MVCI, pain medication, accommodations, and possible transfer to another prison. [Doc. 2: Compl. at ¶ 122 (Jan. 25, 2018 inmate request to Melton and Slagle), 125 (Feb. 20, 2018 inmate request to Melton and Slagle), 130 (March 10, 2018 letter to Slagle), 135 (May 1, 2018 phone call with Melton), 154 (Oct. 23, 2018 phone call with Melton), 156 (Oct. 25, 2018 phone call with Slagle)]. Melton told the Plaintiff's family that she thought that the Plaintiff's "pains are not serious." [Id. at ¶ 154 (Oct. 23, 2018 comment to Plaintiff's fiancée)]. Meetings between the Plaintiff and Melton were unproductive and contentious. [Id. at ¶¶ 152 (Oct. 19, 2018 meeting), 186 (Jan. 24, 2019 meeting)]. The Plaintiff attempted to discuss his medical concerns with Warden Slagle once, but Slagle walked away. [Id. at ¶ 158 (Nov. 2, 2018)].

The Plaintiff submitted five grievances addressing PA Patane, which the Plaintiff appealed through all three steps of NCDPS's Administrative Remedy Procedure ("ARP").[11] [Doc. 116: Plaintiff's Affid. at ¶ 1; see, .e.g.,

---

[11] Patane is aware of only one fully exhausted grievance addressing him, No. 4855-2017-HPOD-06456. [Doc. 113: Patane Decl. at ¶ 25(f)].

Doc. 2: Compl. Ex at 53-66 (Grievance No. 4855-2018-HPOD-09756); Doc. 98: Patane MSJ Ex at 1-10 (Grievance No. 4855-2017-HPOD-06456)].

## IV. DISCUSSION

### A. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA") requires a prisoner to exhaust his administrative remedies before filing a § 1983 action. 42 U.S.C. § 1997e(a). The PLRA provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Id. The PLRA's exhaustion requirement applies to all inmate suits about prison life. Porter v. Nussle, 534 U.S. 516, 532 (2002). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." Jones v. Bock, 549 U.S. 199, 211 (2007) (citing Porter, 534 U.S. at 524). Because exhaustion of administrative remedies is an affirmative defense, defendants have the burden of pleading and proving lack of exhaustion. Id. at 216.

The NCDPS has established, in its ARP, a three-step procedure governing submission and review of inmate grievances. Moore v. Bennette, 517 F.3d 717, 721 (4th Cir. 2008). An inmate does not exhaust his

administrative remedies with the NCDPS until he completes all three steps of the ARP.  Id.

Defendant Patane contends that the claims against him, save those addressing incidents that allegedly occurred on December 1, 2017, should be dismissed as unexhausted.  [Doc. 96: Patane MSJ Memo. at 10-12].  The forecast of evidence shows, however, that the Plaintiff fully exhausted five grievances addressing Defendant Patane.  [See Doc. 116: Plaintiff's Affid. at ¶ 1].  Patane has thus failed to carry his burden to demonstrate lack of exhaustion, and summary judgment will be denied on this ground.  See Jones, 549 U.S. at 216.

### B.    Deliberate Indifference to a Serious Medical Need

Claims under 42 U.S.C. § 1983 based on an alleged lack of or inappropriate medical treatment fall within the Eighth Amendment's prohibition against cruel and unusual punishment.  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  To state a claim under the Eighth Amendment, a plaintiff must show a "deliberate indifference to serious medical needs" of the inmate.  Id.

A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v.

Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (internal quotation marks omitted). Deliberate indifference requires a showing that the defendants actually knew of and disregarded an excessive risk to inmate health or safety. Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)). An official acts with deliberate indifference if he had actual knowledge of the prisoner's serious medical needs and the related risks but nevertheless disregards them. DePaola v. Clarke, 884 F.3d 481, 486 (4th Cir. 2018). The prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837.

Allegations that might be sufficient to support negligence and medical malpractice claims do not, without more, rise to the level of a cognizable Section 1983 claim. Estelle, 429 U.S. at 106. "[E]ven if a prison doctor is mistaken or negligent in his diagnosis or treatment, no constitutional issue is raised absent evidence of abuse, intentional mistreatment, or denial of medical attention." Stokes v. Hurdle, 393 F. Supp. 757, 762 (D. Md. 1975), *aff'd*, 535 F.2d 1250 (4th Cir. 1976). Further, the constitutional right is to medical care. No right exists to the type or scope of care desired by the individual prisoner. Id. at 763. Therefore, a disagreement "between an inmate and a physician over the inmate's proper medical care [does] not

state a § 1983 claim unless exceptional circumstances are alleged." <u>Wright</u> <u>v. Collins</u>, 766 F.2d 841, 849 (4th Cir. 1985).

### 1.    Defendants Patane, Melton, Barrier, and Campbell

The forecast of evidence demonstrates that the Plaintiff received ongoing medical care at MVCI, including numerous sick and emergency visits, radiology, medications, and outside appointments and treatments. That the Plaintiff would have preferred specific medications, treatments, appointments, and accommodations at particular times does not equate to deliberate indifference.  <u>See</u> <u>Wright v. Collins</u>, 766 F.2d 841, 849 (4th Cir. 1985); <u>also</u> <u>see</u> <u>Lewis v. Proctor</u>, 2010 WL 148383, * 3 (N.D.W.Va. Jan. 12, 2010)(an inmate's belief that one doctor's treatment plan was better than another's does not state a constitutional violation); <u>Oglesby v. Abbassi</u>, 2013 WL 4759249, *7, n. 12 (E.D.Va. Sep. 4, 2013)("certainly no claim is stated when a doctor disagrees with the professional judgment of another doctor").

While the Plaintiff claims that he was wrongfully denied certain medical care recommended by outside providers, the Plaintiff was not entitled to receive medications and treatments recommended by outside doctors and/or approved by UR with which the MVCI medical personnel disagreed.  The Defendants had significantly more experience with and opportunities for first-hand observation of the Plaintiff than the outside providers did, and the

Defendants used their clinical expertise and personal observation of the Plaintiff to determine whether such recommendations were warranted. Their professional disagreement with the opinions of outside medical providers does not constitute deliberate indifference under the circumstances. Moreover, the Plaintiff's complaints that these Defendants' behavior was sometimes rude or unprofessional is insufficient to show deliberate indifference. See Morgan v. Buncombe Cnty., No. 1:16-cv-286-FDW, 2016 WL 4585900, at *2 (W.D.N.C. Sept. 1, 2016) ("It is well settled that rudeness and unprofessionalism by prison staff do not constitute a federal or constitutional violation under Section 1983."). Similarly, the Defendants' skepticism of the Plaintiff's reports of pain likewise fails to show deliberate indifference rather than a mere difference of opinion. Estelle, 429 U.S. at 106; Wright, 766 F.2d at 849. Indeed, the Defendants' skepticism of the Plaintiff's complaints of pain was validated by the results of the Plaintiff's psychological testing, which reflected malingering. [Doc. 111: Patane Ex at 1 (Psych. Tests)]. The Plaintiff's self-serving and conclusory contentions that the Defendants were deliberately indifferent to a serious medical need are insufficient to create a genuine issue for trial. See Wright, 766 F.2d at (affirming summary judgment for defendants where plaintiff was provided

with medical treatment by the defendant doctor and others on numerous occasions despite plaintiff's allegations that the treatment was inadequate).

To the extent that the Plaintiff contends that Defendant Melton was deliberately indifferent in her supervisory nursing role, this necessarily fails because there is no forecast of evidence that any underlying constitutional violation occurred. See generally Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994) (a public official may be liable for indifference or tacit authorization of a subordinate's misconduct); Givens v. O'Quinn, 121 F. App'x 984, 991 n.6 (4th Cir. 2005) (in the absence of an underlying constitutional violation, a supervisory claim necessarily fails).

The Plaintiff has failed to demonstrate the existence of a genuine dispute of material fact that Defendants Patane, Melton, Barrier, and Campbell were deliberately indifferent to a serious medical need, and these Defendants will be granted summary judgment on this ground.

### 2. Warden Slagle

The undisputed forecast of evidence shows that Defendant Slagle is a non-medical prison warden who lacks access to prisoner medical records, has no authority to authorize medical accommodations or to make any medical decisions; that he relied on the prison's medical staff to manage the Plaintiff's care; and that he has no control over facility transfers. Defendant

Slagle's mere knowledge that the Plaintiff and his family were dissatisfied with the care at MVCI is insufficient to establish that Slagle was deliberately indifferent to any serious medical need.  See Miltier v. Beorn, 896 F.2d 848, 854 (4th Cir. 1990) (prison wardens were entitled to summary judgment where no record evidence suggested why they should not have been entitled to rely on their health care providers' expertise); Amisi v. Brooks, 93 F.4th 659, 670 (4th Cir. 2024) (the "requisite causal connection" between defendant and a violation can be established if the defendant "set[s] in motion a series of acts by others which the actor[] know[s] or reasonably should know would cause others to inflict the constitutional injury"); Williamson v. Stirling, 912 F.3d 154, 171 (4th Cir. 2018) (mere knowledge of a deprivation is insufficient).  Moreover, as discussed supra, any supervisory claim against Warden Slagle fails because the forecast of evidence does not demonstrate the existence of an underlying constitutional violation.  Givens, 121 F. App'x at 991 n.6.  Accordingly, summary judgment will be granted in favor of Warden Slagle.

### C.  Qualified Immunity

"Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." Henry v. Purnell, 652 F.3d 524, 531

(4th Cir. 2011) (en banc). "To determine whether an officer is entitled to qualified immunity, the court must examine (1) whether the plaintiff has demonstrated that the officer violated a constitutional right and (2) whether that right was clearly established at the time of the alleged violation." E.W. ex rel. T.W. v. Dolgos, 884 F.3d 172, 178 (4th Cir. 2018) (internal quotation marks omitted). The doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." Smith v. Ray, 781 F.3d 95, 100 (4th Cir. 2015) (internal quotation marks omitted). Here, the Plaintiff has not forecasted evidence that the Defendants violated a constitutional right. Therefore, the Defendants are also entitled qualified immunity, and their Motions for Summary Judgment are granted on this ground as well.

## IV. CONCLUSION

For the reasons stated herein, the Defendants' Motions for Summary Judgment are granted, and this action is dismissed with prejudice.

## ORDER

**IT IS, THEREFORE, ORDERED** that the Defendants' Motions for Summary Judgment [Docs. 87, 94] are **GRANTED**, and this action is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

Signed: August 12, 2024

Martin Reidinger
Chief United States District Judge